[PUBLISH]

In the

# United States Court of Appeals

For the Eleventh Circuit

_____

No. 22-10647

_____

GSE CONSULTING, INC.,

                                                        Plaintiff-Appellant,

*versus*

L3HARRIS TECHNOLOGIES, INC.,

                                                        Defendant-Appellee.

_____

Appeal from the United States District Court
for the Middle District of Florida
D.C. Docket No. 6:20-cv-01853-RBD-DCI

_____

Before ROSENBAUM and LAGOA, Circuit Judges, and WETHERELL,[*] District Judge.

LAGOA, Circuit Judge:

This appeal centers around the question of what it means for intellectual property to "merge." Under the terms of a consulting agreement between GSE Consulting, Inc. ("GSE") and Harris Corporation ("Harris"), GSE is entitled to a payment of up to four million dollars in the event that certain intellectual property owned by Harris is "sold, merged or transferred" but did not form "the primary basis of the sale." GSE contends that the relevant intellectual property, held by a subsidiary of one of Harris's subsidiaries, necessarily "merged" when Harris used a different subsidiary to effectuate a comprehensive reverse triangular merger with an outside company and thus triggered Harris's payment obligation under the parties' agreement. L3Harris,[1] however, maintains that Harris's participation in the reverse triangular merger did not cause the relevant intellectual property to "merge," and has accordingly refused to make the demanded payment. The district court agreed with

---

[*] Honorable T. Kent Wetherell, II, United States District Judge for the Northern District of Florida, sitting by designation.

[1] After the reverse triangular merger was completed, Harris changed its name to L3Harris Technologies, Inc. ("L3Harris") and that entity is the Defendant-Appellee in this case. We will refer to Harris when describing events occurring before the reverse triangular merger and we will refer to L3Harris when describing events occurring after the merger.

L3Harris and dismissed GSE's breach of contract claim on summary judgment.

After careful review, and with the benefit of oral argument, we affirm the district court's ruling.

## I.   FACTUAL AND PROCEDURAL HISTORY

GSE is a Washington corporation that offers research and consulting services related to infrastructure and energy. GSE's founder and president is George Taylor. L3Harris is a Delaware corporation that specializes in defense and information technology.

In 2008, GSE and Harris began discussing the idea of using radio frequency heating technology to recover heavy oil from oil sands. Those discussions culminated in the two companies developing intellectual property related to radio frequency heating, including a process known as "Effective Solvent Extraction System Incorporating Electromagnetic Heating." To formalize the terms of GSE's continued involvement in the development of oil recovery technology, the parties executed a consulting agreement on August 1, 2010 (the "Consulting Agreement").

Under that agreement, GSE was required to furnish "on call" consulting services to Harris through December 31, 2022, and

any intellectual property developed by GSE while engaged in work for Harris would belong to Harris.[2]

In exchange, the Consulting Agreement sets forth two compensation categories for GSE: base pay and special intellectual property payments. In the ordinary course, GSE is entitled to specified hourly rates and a right of first refusal for ten percent of the direct labor workshare of Harris's projects involving radio frequency heating of hydrocarbons. In the event of certain dealings involving the relevant intellectual property, however, GSE is entitled to additional "intellectual property fees."

Those additional "intellectual property fees" are discussed in Attachment F of the Consulting Agreement, which contains six sections. The first section sets forth definitions for "Intellectual Property" and "Net Acquisition Value." The second section governs GSE's special compensation in the event that Harris sells the relevant intellectual property. The third section governs GSE's special compensation in the event that Harris licenses the relevant intellectual property. The fourth section is titled "Business Development" and governs GSE's special compensation in the event that "the IP is a primary basis for a third party's financial contribution to a business entity created solely or jointly by Harris." The fifth section caps GSE's total recovery under Attachment F at seven million dollars. The sixth and final section, titled "Miscellaneous,"

---

[2] Taylor separately assigned to Harris his patent rights in Effective Solvent Extraction System Incorporating Electromagnetic Heating.

22-10647               Opinion of the Court                     5

contains the following language, which lies at the heart of the parties' dispute:

> b. *Payments calculation for the following to be 3% of market capitalization, capped at $4M:*
>
>> i. *in the event the IP is sold, merged or transferred and the primary basis of the sale is not the IP.*
>>
>> ii. *in the event the IP is exclusively licensed and the primary basis of the license is not the IP.*
>>
>> iii. *in the event the IP is utilized in a Business Development, but the primary basis of the business development is not the IP.*

Doc. 51-1 at 15, § 6(b) (emphasis added).

Separately, the Consulting Agreement also contains a Florida choice-of-law and choice-of-venue provision, an integration clause, a severability clause, and a provision confirming that both parties understood the terms of the agreement and had an opportunity to consult with counsel before execution.

On January 1, 2016, Harris transferred all of its intellectual property to one of its subsidiaries, Harris International, Inc., which then likewise conveyed the intellectual property to its own subsidiary, Eagle Technology, LLC ("Eagle"). The intellectual property discussed in the Consulting Agreement was included in those transfers and remains held by Eagle as of this lawsuit.

| 6 | Opinion of the Court | 22-10647 |
|---|---|---|

In 2018, Harris and L3 Technologies, Inc. ("L3"), announced their intention to merge. The next year, the companies participated in a reverse triangular merger. The standard reverse triangular merger proceeds as follows: an acquiring company creates a transitory subsidiary, that subsidiary merges into a target company, and then that target company survives as the new subsidiary of the acquiring company. Here, Leopard Merger Sub Inc. ("Leopard") was the subsidiary of Harris that merged into L3, and, as a result of that merger, L3 became a subsidiary of Harris. This is when Harris adopted its current name, L3Harris.

The terms of the reverse triangular merger involving Harris, Leopard, and L3, are set forth in the Plan of Merger (the "Plan"). As relevant to this appeal, the Plan implicates, among other things, the intellectual property discussed in the Consulting Agreement.

Section 5.15 of the Plan provides that each party to the reverse triangular merger "exclusively own[s] all right, title and interest to its Company Intellectual Property"[3] and will continue to "own or have sufficient rights to use all Intellectual Property used in or necessary for the operation of their respective businesses as presently conducted, and all such rights will survive unchanged after the consummation of the [reverse triangular merger]."[4] Section

---

[3] The Plan defines "Company Intellectual Property" to mean "all Intellectual Property owned or purported to be owned by L3 and its Subsidiaries or Harris and its Subsidiaries, as applicable." Doc. 55-9 at 83.

[4] The Plan defines "Intellectual Property" to mean:

22-10647               Opinion of the Court                    7

5.15 also contains representations that none of the parties to the reverse triangular merger has knowledge of any claims of infringement, misappropriation, or other violations regarding its own intellectual property, and that each party "has taken commercially reasonable efforts . . . to protect and maintain its Company Intellectual Property." Similarly, Section 8.1 of the Plan provides that each party to the reverse triangular merger "shall not . . . cancel, abandon or otherwise allow to lapse or expire any Intellectual Property that is material to the businesses of L3 and its Subsidiaries or Harris and its Subsidiaries" as conducted at the time of the Plan. Despite these terms, it is undisputed that the intellectual property discussed in the Consulting Agreement was not the primary basis of the reverse triangular merger.

Following the execution of this reverse triangular merger, GSE sent L3Harris an invoice for four million dollars, invoking Section 6(b)(i) of Attachment F to the Consulting Agreement. GSE's position is that all of Harris's intellectual property, including the

---

all intellectual property anywhere in the world (whether foreign, state or domestic, registered or unregistered), including: (a) patents and utility models of any kind . . . , (b) trademarks, service marks, trade dress, logos, Internet domain names, uniform resource locators, and other similar identifiers of origin . . . , (c) copyrights, rights under copyrights and industrial designs . . . , (d) trade secrets and other rights in know-how and confidential or proprietary information . . . , and (e) all other intellectual property rights recognized by applicable Law.

Doc. 55-9 at 84–85.

intellectual property discussed in the Consulting Agreement, was "merged" as a result of the reverse triangular merger because it was "addressed [by] and included in" the Plan. L3Harris ultimately rejected that position and refused to pay the invoice. L3Harris also subsequently shut down the radio frequency heating program in the spring of 2020. According to Taylor, this post-transaction shutdown is precisely the sort of risk that Section 6(b)(i) was meant to mitigate through compensation.

On October 6, 2020, GSE filed suit in the United States District Court for the Middle District of Florida. GSE brought a single breach of contract claim against L3Harris for failing to pay the intellectual property fee contemplated by Section 6(b)(i).

A year later, GSE and L3Harris filed cross-motions for summary judgment.[5] GSE argued that the reverse triangular merger constituted a "merger" of Harris and that Section 6(b)(i) unambiguously requires payment of the intellectual property fee in such

---

[5] The summary judgment record includes, among other things, (1) the parties' joint stipulation of agreed material facts; (2) the Consulting Agreement; (3) the Plan; (4) the testimony of George Taylor, the founder and president of GSE; (5) the testimony of Derik Ehresman, the senior program manager in charge of the radio frequency heating program at Harris; (6) the testimony of Mark Blue, a Harris employee who reported to Ehresman; (7) the testimony of Mitch Evander, L3Harris's Chief Intellectual Property Counsel; (8) the testimony of Stephen Moore, the Harris employee who worked on the negotiations for the Consulting Agreement; (9) the testimony of Donald Teichen, one of L3Harris's senior principals and Eagle's corporate representative; (10) the testimony of Robert Johnson, the corporate representative of L3Harris; and (11) the testimony of Terry Sanks, an intellectual property attorney.

cases. In the alternative, GSE argued that, even if Section 6(b)(i) is considered ambiguous, the drafting history of the Consulting Agreement and the testimony of the employees involved in the negotiating its terms establish that Section 6(b)(i) was meant to cover transactions like the reverse triangular merger at issue. L3Harris, meanwhile, argued that Section 6(b)(i) requires payment only in the event that the intellectual property is merged (or sold or transferred) and maintained that no such merger (or sale or transfer) occurred as part of the reverse triangular merger. L3Harris also argued that the consideration of extrinsic evidence is precluded as a matter of Florida law by the unambiguous nature of Section 6(b)(i) and by the Consulting Agreement's integration clause.

On February 1, 2022, the district court entered its summary judgment order, denying GSE's motion and granting L3Harris's. In so ruling, the district court found that Section 6(b)(i) "unambiguously means what it says: payment is triggered 'in the event the *IP* is sold, merged or transferred' – not [Harris]." The district court also rejected the notion that the intellectual property "merged" simply because it was addressed in the Plan. Instead, the district court concluded that the reverse triangular merger did not trigger payment under Section 6(b)(i) because it did not affect any rights with respect to the relevant intellectual property and because the relevant property remained held by Eagle at all material times. The district court accordingly entered judgment in favor of L3Harris.

GSE filed a timely notice of appeal.

## II. STANDARD OF REVIEW

We review *de novo* a district court's grant of summary judgment. *Marbury v. Warden*, 936 F.3d 1227, 1232 (11th Cir. 2019). Summary judgment is proper when the evidence, viewed in a light most favorable to the non-moving party, "presents no genuine issue of material fact and compels judgment as a matter of law in favor of the moving party." *Id.* (quoting *Caldwell v. Warden*, 748 F.3d 1090, 1098 (11th Cir. 2014)). We likewise review *de novo* a district court's interpretation of a contract. *Hegel v. First Liberty Ins. Corp.*, 778 F.3d 1214, 1219 (11th Cir. 2015).

### III.    ANALYSIS

The issue on appeal is whether the intellectual property discussed in the Consulting Agreement "merged," for purposes of Section 6(b)(i) of Attachment F, as a result of the reverse triangular merger involving Harris and L3. We hold that it did not.

We begin with the meaning of the word "merged," as used in Section 6(b)(i). Under Florida law, which the parties agreed applies to the Consulting Agreement, "[w]here the terms of a contract are clear and unambiguous, the parties' intent must be gleaned from the four corners of the document." *Crawford v. Barker*, 64 So. 3d 1246, 1255 (Fla. 2011). "In such a situation, 'the language itself is the best evidence of the parties' intent, and its plain meaning controls.'" *Id.* (quoting *Richter v. Richter*, 666 So. 2d 559, 561 (Fla. Dist. Ct. App. 1995)). Moreover, courts properly may consult dictionaries to ascertain the plain meaning of language. *Walsh v. Walsh*, 262 So. 3d 212, 215 (Fla. Dist. Ct. App. 2018).

In the ordinary sense, to be "merged" means to be combined. *See Merge*, *Merriam-Webster*, https://www.merriam-webster.com/dictionary/merging (defining "merge" to mean "to become combined into one"); *Merge*, *Oxford English Dictionary*, https://www.oed.com/view/Entry/116760 (defining "merge" to mean "to join or blend, esp[ecially] gradually; to combine, amalgamate"); *see also Code Revision Comm'n for Gen. Assembly v. Public.Resource.Org, Inc.*, 906 F.3d 1229, 1248–49 (11th Cir. 2018) (listing various formulations of the ordinary meaning of the word "merge"). When referring to corporations, however, a "merger" describes the consolidation of two or more corporations into one, surviving corporation. *See Merger*, *The Law Dictionary*, https://thelawdictionary.org/merger/ (defining the merger of corporations as "the uniting of two or more corporations by the transfer of property of all to one of them, which continues in existence, the others being swallowed up or merged therein"); *Merger*, *Merriam-Webster*, https://www.merriam-webster.com/dictionary/merger (defining merger in the context of corporations to mean the "absorption by a corporation of one or more others"). Although Section 6(b) generally pertains to corporate transactions, the object of the sentence that forms Section 6(b)(i) is the relevant intellectual property. For this reason, we read Section 6(b)(i) to

unambiguously use the ordinary definition of the term "merged," i.e., to be combined.[6]

But we also recognize that there is more than one way in which things (here, intellectual property) can be combined and satisfy the ordinary definition of the term "merged." For instance, things can be substantively combined, i.e., blended or mixed together, to create a new thing. *See Public.Resource.Org, Inc.*, 906 F.3d at 1249 ("The use of the word 'merge' thus carries with it strong connotations of unification or combination of disparate elements into a single whole in which the previously distinct attributes of each element become intermingled and shared."). Alternatively, things can be combined simply as a matter of grouping, i.e., pooled together for a certain purpose.

Even so, the reverse triangular merger at issue did not "merge," i.e., combine, the relevant intellectual property in any ordinary way. As detailed above, the Plan contains assurances regarding the validity, right to continued use, and maintenance of each party's intellectual property. And, given its broad definitions of "Company Intellectual Property" and "Intellectual Property," the Plan certainly reaches the intellectual property held by Eagle as subsidiary of one of Harris's subsidiaries. Critically, however, the Plan neither blends, pools, nor otherwise combines the intellectual

---

[6] At multiple points in its briefs, GSE recognizes that this ordinary definition of the term "merged" applies.

property held by Eagle with any other intellectual property. Therefore, the intellectual property discussed in the Consulting Agreement was not "merged," for purposes of Section 6(b)(i), as a result of the reverse triangular merger, and the district court did not err in entering summary judgment in favor of L3Harris.

None of the arguments that GSE raises on appeal warrants reaching a different conclusion.

GSE's primary argument is that, when read holistically, Section 6(b)(i) is meant to ensure compensation in the event of large-scale corporation transactions, including corporate mergers. In making this argument, GSE underscores that the payment contemplated by Section 6(b)(i) is (1) conditioned upon the primary basis of the sale being something other than the intellectual property and (2) calculated based on market capitalization. But these aspects of Section 6(b)(i) do not change the plain meaning of the requirement that the relevant intellectual property be "sold, merged or transferred." Nor do they otherwise establish a broad intent to guarantee compensation in the event of corporate mergers without differentiation. Rather, as it plainly states, Section 6(b)(i) guarantees GSE an intellectual property fee if two conditions are met—i.e., the intellectual property is "sold, merged or transferred" and is not "the primary basis of the sale"—and that fee is calculated based on the

affected market capitalization. This arrangement is consistent with the district court's interpretation and ruling.[7]

GSE's alternative argument, meanwhile, assumes that Section 6(b)(i) is ambiguous and then relies on evidence beyond the four corners of the Consulting Agreement, including the testimony of individuals involved in the negotiation and drafting process. But because the language of Section 6(b)(i) is unambiguous, Florida law forbids us from "entertain[ing] evidence contrary to its plain meaning." *Sheen v. Lyon*, 485 So. 2d 422, 424 (Fla. 1986); *accord Emergency Assocs. of Tampa, P.A. v. Sassano*, 664 So. 2d 1000, 1003 (Fla. Dist. Ct. App. 1995) ("[W]hen the terms of a voluntary contract are clear and unambiguous, as here, the contracting parties are bound by those terms, and a court is powerless to rewrite the contract to make it more reasonable or advantageous for one of the contracting parties."). Accordingly, we conclude that GSE's alternative argument is unavailing.

### IV.   CONCLUSION

---

[7]GSE also contends that the district court committed reversible error by rejecting GSE's interpretation without "articulat[ing] an affirmative meaning for the disputed language" and "clarifying what such language *means*." This contention lacks merit. The district court adequately engaged with the language of Section 6(b)(i) by explaining that the "sold, merged or transferred" requirement is in reference to the intellectual property itself and is unsatisfied where the intellectual property is merely "involved in" a sale, merger, or transfer of something else.

For these reasons, we affirm the district court's order granting summary judgment in favor of L3Harris.

**AFFIRMED.**